UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR 10-30014-RAL |
| | * | |
| Plaintiff, | * | |
| | * | OPINION AND ORDER |
| vs. | * | GRANTING IN PART AND |
| | * | DENYING IN PART MOTION |
| JASON TODD GARREAU, | * | TO SUPPRESS EVIDENCE AND |
| | * | STATEMENTS |
| Defendant. | * | |

## I. INTRODUCTION

This matter is before the Court on the Report and Recommendation (Doc. 29) and

Corrigendum/Clarification of Report and Recommendation (Doc. 32) issued by the United

States Magistrate Judge, which recommends that this Court grant in part and deny in part

Defendant Jason Todd Garreau's motion to suppress evidence (Doc. 14). Garreau filed a

statement of objections (Doc. 37) to the Report and Recommendation and

Corrigendum/Clarification of Report and Recommendation, as allowed by 28 U.S.C. §

636(b)(1). Under section 636(b)(1)(C), this Court makes a de novo determination of those

portions of the Report and Recommendation to which the parties object. United States v.

Lothridge, 324 F.3d 599, 600-01 (8th Cir. 2003).

## II. FACTS

On January 5, 2009, Federal Bureau of Investigation ("FBI") Agent James Van Iten

contacted Pierre Police Officer John Wollman.[1]  (T.44).  Agent Van Iten advised Officer

Wollman that a confidential source had reported that Garreau was possibly in possession of a

stolen firearm and was en route from Eagle Butte to Pierre, South Dakota, to sell the

handgun.  (T. 32-33).  Agent Van Iten also informed Officer Wollman that Garreau was

driving a gray 2005 Chevy Impala with South Dakota license plates 24R717.[2]  Officer

Wollman then contacted State Radio dispatch and Pierre Police Department dispatch, which

advised him that Garreau's driver's license had been suspended and that there was an active

warrant for Garreau's arrest in Pennington County, South Dakota, for failure to appear on a

driving under suspension charge.  (T. 33).  After learning that Trooper Jon Stahl of the South

Dakota Highway Patrol was in the vicinity, Officer Wollman notified him to be on the

lookout for the vehicle being driven by Garreau.

     While driving west of Fort Pierre, South Dakota, Trooper Stahl spotted a vehicle

matching the description of Garreau's vehicle traveling east on U.S. Highway 14.  (T. 8).

Using his radar, Trooper Stahl clocked the speed of the vehicle at 71 miles per hour, which

exceeded the speed limit of 65 miles per hour.  (T. 8).  Trooper Stahl pulled the vehicle over

and advised the driver - the sole occupant - of the reason for the stop.  Ex. 4, at 1.  The driver

could not produce a driver's license and instead presented a Cheyenne River Sioux Tribal

identification card identifying himself as Garreau.  (T. 8-9).

--------------------------------------------------

[1]At the time, both Agent Van Iten and Officer Wollman were members of the Northern Plains Safe Trails Drug Enforcement Task Force.  Officer Wollman also has deputization from the FBI.  (T. 32).

[2]The vehicle was owned by Rebecca LaPlante.  Garreau had LaPlante's authorization to use the car on the day of his arrest.  (T. 19, 55).

Trooper Stahl instructed Garreau to sit in the patrol car. (T. 9). While Garreau sat in the patrol car, Trooper Stahl completed a warning ticket for the speeding violation, ran a check on Garreau, and learned that Garreau's driver's license had been suspended and that an outstanding warrant for driving with a suspended license existed for Garreau. (T.9). Trooper Stahl then placed Garreau under arrest, handcuffed him, searched him, and placed him in the back of the patrol car. (T. 9-10). The search of Garreau's person yielded a knife, which Trooper Stahl confiscated. Trooper Stahl then asked Garreau if he knew someone who could come and get the vehicle and Garreau responded in the negative. (T. 10). Trooper Stahl's report lists the time of the arrest as 1320 hours. Ex. 4, at 1.

After Trooper Stahl initially placed Garreau in the patrol car to complete the warning ticket and run a check on Garreau, Officer Wollman arrived at the scene as backup because of the probability of a handgun in the vehicle. (T. 23). Once Garreau was removed from the patrol car and placed under arrest, Officer Wollman exited his vehicle and engaged in conversation with Trooper Stahl. (T. 37). According to Trooper Stahl's case report, "[a] search of the vehicle was conducted," but the report made no reference to an inventory search. Ex. 4, at 2 (T. 21-22). The search was conducted without a warrant or Garreau's consent. (T. 21). Trooper Stahl searched the vehicle after Garreau was arrested, with Officer Wollman present, and the two discussed searching for the stolen gun. (T. 46). Trooper Stahl testified that he looked for the handgun while searching the car. (T. 22). After opening the trunk to the vehicle, Trooper Stahl lifted the carpeting covering a compartment underneath in which the spare tire sat. (T. 25-26). Upon lifting the spare tire and examining the tire well, Trooper Stahl discovered a white plastic bag underneath the tire. (T. 26). He searched the

-3-

bag, which required removal of the spare tire, and found a Desert Eagle .44 caliber handgun.
(T. 15, 49).  Trooper Stahl seized the handgun, checked its serial number, and learned
through State Radio that the gun had been reported stolen from Huron, South Dakota.

After Trooper Stahl found the gun, Officer Wollman went to Trooper Stahl's patrol
car and asked Garreau about the firearm.  (T. 37).  During this conversation, Garreau
acknowledged that he knew the gun was stolen.  (T. 38).  Officer Wollman testified that at no
time prior to or during the conversation was Garreau advised of his <u>Miranda</u> rights.  (T. 50).
At no time prior to the search of the car and Officer Wollman's questioning did Garreau say
anything about a stolen firearm.  (T. 51).

Subsequently, police took Garreau to the Hughes County Jail in Pierre, where he was
interviewed by Officer Wollman and Jason Baldwin, a Special Agent with the South Dakota
Division of Criminal Investigation ("DCI").  (T. 39).  The interview began at 1427 hours.
Ex. 5, at 1.  There, after being read his <u>Miranda</u> rights, Garreau agreed to talk to investigators
and signed an advice of rights and waiver of rights form as well as a form consenting to a
urine sample.  (T. 40); Ex. 5.  During the interview, Garreau made incriminating statements
regarding the gun.  (T. 41).  At the conclusion of the interview, Garreau provided a urine
sample.  At no point during the interview did Officer Wollman or Agent Baldwin raise their
voices at Garreau, and Garreau never raised his voice at them or indicated that he wanted to
terminate the interview or speak with a lawyer.  (T. 43-44).

At some point, Trooper Stahl completed form HP-219D, which is required by Section
9.1401 of the South Dakota Highway Patrol Vehicle Inventory Searches policy. Ex. 2.  Form
HP-219D, entitled "Vehicle Inventory," listed as inventory miscellaneous CD's, a cell phone,

four empty Crown Royal bags, miscellaneous paperwork, a roofing hammer, a child seat, two

presents consisting of children's toys, cold weather gear, and miscellaneous clothing.  Ex. 3.

Form HP-219D did not list the handgun.  (T. 28).  Officer Wollman's report characterized the

search as a "search incident to an arrest" and prior to towing of the vehicle.  (T. 49, 51).

Officer Wollman's report made no specific reference to an inventory search.  (T. 49).

       Citing <u>Arizona v. Gant</u>, 129 S.Ct. 1710 (2009), Garreau moved to suppress the

handgun on the grounds that it was obtained during an invalid search incident to arrest.  He

further seeks to suppress the statements made at the scene for being obtained in violation of

<u>Miranda</u>.  In addition, he moves to suppress the statements made and the urine sample given

at the jail as fruits of the poisonous tree.

## III. DISCUSSION

### A. Search and Seizure of the Handgun

       In <u>Gant</u>, the Supreme Court held that:

> Police may search a vehicle incident to a recent occupant's arrest only if the
> arrestee is within reaching distance of the passenger compartment at the time
> of the search or it is reasonable to believe that a vehicle contains evidence of
> the offense of arrest.  When these justifications are absent, a search of an
> arrestee's vehicle will be unreasonable unless police obtain a warrant or show
> that another exception to the warrant requirement applies.

129 S.Ct. at 1723-24.  Garreau argues that because he had already been removed from his

vehicle, handcuffed, and placed in the back of Trooper Stahl's patrol car prior to the search,

the search of the vehicle, incident to arrest, and the seizure of the handgun found in it, were

unconstitutional.  Defendant further contends neither the "automobile exception" nor the

"inventory search" exception to the Fourth Amendment's warrant requirement may validate

the search and seizure of the handgun in this case.

The Government concedes[3] that Trooper Stahl's search was not a valid search incident to arrest under Gant.[4]  Relying on cases decided after Gant, the Government argues that the search was a constitutionally valid inventory search.  (Doc. 23, at 4); see e.g., United States v. Garrison, No. 10-00033-01-CR-W-ODS, 2010 U.S. Dist. LEXIS 51791, at *6-8 & n.3 (W.D. Mo. May 24, 2010); Scroggins, 2010 U.S. Dist. LEXIS 17357, at *9-12; United

_____

[3] The Government was asked at the suppression hearing by the Magistrate Judge, "are you relying solely on an inventory search exception . . . to the search warrant requirement or are you doing something else to get around the Gant rule?"  The Government replied:

> Your Honor, I am perfectly capable of having missed and not put in the probable cause search exception clearly, but in this instance, I did it on purpose.  I am only relying on what I have relied upon in the brief and that is inventory search."

(T. 6).

[4]Despite the Government's concession, there appears to be a serious question as to whether Gant applies to a search conducted, like this one, before the release of the Gant decision. Various courts have concluded that for searches conducted before Gant was decided, the previous state of law controls because officers acted in good faith reliance on the law as it existed prior to Gant.  See United States v. Scroggins, 2010 U.S. Dist. LEXIS 173507, No. 09:00060-01-CR-W-DW, at *9-10 (W.D. Mo. Feb. 8, 2010), adopted at 2010 U.S. Dist. LEXIS 17350 (W.D. Mo. Feb. 26, 2010); United States v. Allison, 637 F. Supp. 2d 657, 669-74 (S.D. Iowa 2009).  The United States Court of Appeals for the Eighth Circuit noted, without deciding the application of, this doctrine in United States v. Hrasky, 567 F.3d 367, 369 (8th Cir. 2009) (noting that the Government had not argued that the good-faith exception to the exclusionary rule should apply, and expressing "no view on whether good-faith reliance on [New York v.] Belton[, 453 U.S. 454 (1981),] would justify an exception to the exclusionary rule if the argument is raised in another case . . .").  Garreau noted that at least one court, the District of Columbia Court of Appeals, has found that the good-faith exception did not apply to a particular pre-Gant vehicle search.  See United States v. Debruhl, 993 A.2d 571, 589 (D.C. Apr. 22, 2010).

The Government bears the burden of proving that an exception to the warrant requirement exists.  United Stats v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (noting that "[t]he exceptions [to the warrant requirement] are jealously and carefully drawn, and there must be a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative." (quoting Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971)).  Because the Government made no attempt - indeed, it expressly declined to make such an attempt - to meet its burden that it was acting in good faith reliance on pre-Gant precedent, that exception to the warrant requirement does not apply in this case.

States v. Forte, No. 4:08CR00251 JLH, 2009 U.S. Dist. LEXIS 92378, at *2-4 (E.D. Ark.

Sept. 18, 2009); see also United States v. Sands, 329 Fed. Appx. 794, 798 n.1 (10th Cir.

2009) (inventory exception applies to post-Gant searches of vehicles). The Government

contends that "the search incident to arrest was conducted simultaneously with an inventory

search." (Doc. 23, at 4).

       The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const.

amend. IV. A "cardinal principle" in Fourth Amendment search and seizure jurisprudence is

that searches conducted outside the judicial process, i.e. without prior approval by a judge,

are per se unreasonable, "subject only to a few specifically established and well-delineated

exceptions." Mincey v. Arizona, 437 U.S. 385, 390 (1978). When the government seeks to

introduce evidence that was seized during a warrantless search, it "bears the burden of

showing the need for an exemption from the warrant requirement and that its conduct fell

within the bounds of the exception." Kennedy, 427 F.3d at 1144 (citing Marshall, 986 F.2d

at 1173).

       One such exception, which has been recognized and applied for more than three

decades, is an inventory search. South Dakota v. Opperman, 428 U.S. 364, 367-76 (1976);

see also United States v. Hall, 497 F.3d 846, 850 (8th Cir. 2007). This exception is premised

on "three distinct needs: the protection of the owner's property while it remains in police

custody, the protection of the police against claims or disputes over lost or stolen property,

and the protection of the police from potential danger." Opperman, 428 U.S. at 369 (internal

citations omitted). Because they are performing an "administrative caretaking function,"

police need not have a search warrant or probable cause before they conduct an inventory

search of a vehicle.  Id. at 369-70 n.5; United States v. Marshall, 986 F.2d 1171, 1173-74 (8th

Cir. 1993).  In the context of an inventory search, the Government bears the burden to

"produce evidence that impoundment and inventory search procedures were in place and that

law enforcement complied with those procedures." Kennedy, 427 F.3d at 1144 (citing

Marshall, 986 F.2d at 1175-76) (holding that district court erred in admitting evidence seized

in an inventory search when government produced insufficient evidence of compliance with

standardized procedures).

       The central question, when evaluating the propriety of an inventory search, is

whether, under the totality of the circumstances in the particular case, the search was

reasonable.  Hall, 497 F.3d at 851 (citing United States v. Kennedy, 427 F.3d 1136, 1143 (8th

Cir. 2005)); see also Marshall, 986 F.2d at 1174.  Inventory searches that are "conducted

according to standardized police procedures" are reasonable.  Id. (citing Kennedy, 427 F.3d at

1143).  "Adherence to standardized procedures is necessary to ensure that the search is not

merely 'a ruse for general rummaging in order to discover incriminating evidence,' since

inventory searches are often conducted in the absence of the safeguards of a warrant and

probable cause."  Kennedy, 427 F.3d at 1143 (quoting Florida v. Wells, 495 U.S. at 4

(1990)).

       Police may use discretion in conducting an inventory search as to the proper course of

action to take, "so long as that discretion is exercised according to standard criteria and on the

basis of something other than suspicion of evidence of criminal activity."  Hall, 497 F.3d at

851 (quoting Colorado v. Bertine, 479 U.S. 367, 375 (1987)).  An inventory search need not

be made in a "totally mechanical" manner, United States v. Petty, 367 F.3d 1009, 1012 (8th

-8-

Cir. 2004) (quoting Wells, 495 U.S. at 4), but "some degree of 'standardized criteria' or 'established routine' must regulate" an inventory search. Petty, 367 F.3d at 1012 (quoting Wells, 495 U.S. at 4). A police officer's residual judgment that is exercised and based on legitimate concerns related to the purposes of an impoundment does not run afoul of the Constitution. United States v. Kimhong Thi Le, 474 F.3d 511, 514 (8th Cir. 2007) (citing Petty, 367 F.3d at 1012).

"The presence of an investigative motive does not invalidate an otherwise proper inventory search." United States v. Garner, 181 F.3d 988, 991 (8th Cir. 1999) (citing United States v. Lewis, 3 F.3d 252, 254 (8th Cir. 1993); see also Marshall, 986 F.2d at 1175-76. Police "may keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime." Kennedy, 427 F.3d at 1144 (quoting Marshall, 986 F.2d at 1176). Even if a police officer suspects that he might uncover evidence in a vehicle, he can still tow the vehicle and inventory its contents, as long as the impoundment is otherwise valid. Hall, 497 F.3d at 851 (quoting Petty, 367 F.3d at 1013). The Constitution, however, does not permit police to "raise the inventory-search banner in an after-the-fact attempt to justify what was ... purely and simply a search for incriminating evidence." Kennedy, 427 F.3d at 1144 (quoting Marshall, 986 F.2d at 1175).

The Government established at the suppression hearing that the South Dakota Highway Patrol has a standardized Vehicle Inventory Searches policy ("Inventory Policy"), which was in effect at the time of the search. At issue in this case is whether Trooper Stahl was adhering to the Inventory Policy when conducting the search that yielded the handgun.

Trooper Stahl's search did not fully comport to the Inventory Policy. The Inventory Policy describes "[a]n inventory" as "a procedure used to identify and list property that may be located in a vehicle, which is to be impounded or otherwise taken into police custody." Ex. 2, at 1 (Section 9.1401). In Section 9.1403, the Inventory Policy requires an inventory of an impounded vehicle's contents:

> It shall be the policy of the South Dakota Highway Patrol to inventory the contents of all vehicles either impounded or taken into protective custody by its members. The Inventory should include all areas of the vehicle, trunk, glove compartment and luggage or other closed containers within the vehicle. Such Inventory will be made on form HP-219D.

Ex. 2, at 1. The form HP-219D completed by Trooper Stahl failed to list the handgun, despite it being "property" and one of "the contents" of the vehicle. When asked why he did not list the gun on the form, Trooper Stahl testified "[t]he weapon came back stolen, I do not list that on the inventory then." (T. 28). He later stated that "[i]f [the handgun] would not have been a stolen weapon, I would have put it on the form." (Id.). However, the Inventory Policy unambiguously requires Highway Patrol officers to "inventory the contents" and to list such inventory on form HP-219D.[5] Ex. 2, at 1. By its terms, the inventory procedure is used to identify and list "property" located in a vehicle, and it does not distinguish between

---

[5]This opinion does not hold and must not be interpreted to hold that an otherwise valid inventory search is unconstitutional whenever an inventory form required by police department policy is not completed with perfection. Such an interpretation would require inventory searches to be conducted in a "totally mechanical" manner at odds with Wells and Petty. Rather, under the circumstances of this case, in which the omission on the inventory form was of the illegal contraband and comes in conjunction with substantial evidence that the item subject to the motion to suppress was seized as part of a search incident to arrest invalid under Gant, failure to adhere to a standardized procedure prevents the Government from satisfying its burden of showing that its conduct fell within the bounds of the inventory search exception to the warrant requirement.

-10-

property lawfully within the vehicle and stolen property.[6]  The Government presented

insufficient evidence that an exception to the Inventory Policy permitted exclusion of

contraband items from form HP-219D.  This case differs from <u>Garner</u>, in which an inventory

search was found valid even though law enforcement did not complete an inventory form,

because the impound policy at issue in that case did "not require that results of an inventory

search be listed on a specific form nor that the inventory search be conducted in a particular

manner."  181 F.3d at 992.  Additionally, in <u>Garner</u> the vehicle's contents were completely

recorded in other ways through a towing report, a property record, and photographs of the

vehicle's contents, ranging from trash to cash.  <u>Id.</u> at 991.

 The Government's argument that the inventory search exception applies appears to be

an after-the-fact attempt to justify a search incident to arrest contrary to <u>Gant</u>.  Trooper

Stahl's report documents two separate searches.  First, "[a] search of the vehicle was

conducted" immediately after Garreau was arrested.  Ex. 3, at 1-2.  During this search,

Trooper Stahl found the handgun.  <u>Id.</u>  Upon finding the handgun, Trooper Stahl examined

the serial number and ran a check with State Radio to inquire whether the weapon was stolen.

<u>Id.</u> at 2.  Then, according to the report, arrangements were made for towing[7] and an inventory

was conducted.  <u>Id.</u>; <u>see also</u> (T. 49).  These reports indicate that Trooper Stahl at the scene

---

 [6]The record is devoid of any information that the Highway Patrol sought to verify
ownership of other items within the vehicle - such as the CDs, cell phone, children's toys,
clothing, and the like - before deciding whether to list such items on the HP-219D.

 [7]The evidence does not clearly establish when the towing company was contacted.  In his
testimony, Trooper Stahl did not directly answer questioning regarding when the towing
company was called relative to the search in which the gun was seized.  (T. 20-21).  Trooper
Stahl's report initially mentions the search prior to and separate from any reference to towing.
Ex. 3, at 2.

conducted a search incident to arrest of Garreau's car that uncovered the handgun. The

Government does not assert good faith reliance on the law as it existed prior to Gant. Rather,

the Government attempts to justify the search and seizure of the gun based on the inventory

search exception. Under these peculiar circumstances, the Government's use of an inventory

search theory is an after-the-fact attempt to justify what was instead simply a search for

incriminating evidence. Accordingly, evidence of the search of the vehicle and seizure of the

firearm will be suppressed and, therefore, inadmissible at trial, unless an exception to the

exclusionary rule applies.

There are three general exceptions to the exclusionary rule. The first, called the

"attenuated connection" exception, applies when the chain between the challenged evidence

and the primary taint of illegality is so long or only linked by sophisticated argument such

that exclusion is not warranted. Wong Sun, 371 U.S. at 487-88 (rejecting "but for" test for

determining whether evidence is fruit of the poisonous tree and noting that in some cases

connection between illegal conduct and discovery of challenged evidence will "become so

attenuated as to dissipate the taint") (citing Nardone v. United States, 308 U.S. 338, 341

(1939)); see also United States v. Hinojosa, No. 08:05CR145, 2005 U.S. Dist. LEXIS 39921,

at *17 (D. Neb. 2005). Second, the "independent source" exception makes the evidence

admissible if the Government can show that it derived the evidence from a lawful source

independent of the illegal conduct creating the primary taint. Murray v. United States, 487

U.S. 533 (1988) (holding that the independent source doctrine applies not "only to evidence

obtained for the first time during an independent lawful search," but "also to evidence

initially discovered during, or as a consequence of, an unlawful search, but later obtained

-12-

independently from activities untainted by the initial illegality."); see also Wong Sun, 371

U.S. at 487 (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920);

Hinojosa, 2005 U.S. Dist. LEXIS 39921, at *17.  Third, the "inevitable discovery" exception

applies when the Government can establish that the challenged evidence would have been

inevitably discovered without reference to the illegal conduct creating the primary taint.  See

Nix v. Williams, 467 U.S. 431, 441 (1984) (adopting the inevitable discovery exception to

the exclusionary rule).

In this case, the inevitable discovery exception applies to the vehicle search and the

seizure of the handgun.  Otherwise unconstitutionally found evidence "need not be

suppressed if the two prongs of the inevitable discovery doctrine are proved by a

preponderance of the evidence: (1) there is a reasonable probability the evidence would have

been discovered by lawful means in the absence of police misconduct, and (2) the

government was actively pursuing a substantial, alternative line of investigation at the time of

the constitutional violation."  United States v. Munoz, 590 F.3d 916, 923 (8th Cir. 2010)

(citing United States v. Thomas, 524 F.3d 855, 858 (8th Cir. 2008); United States v. Pruneda,

518 F.3d 597, 604 (8th Cir. 2008); see also Nix v. Williams, 467 U.S. 431, 444 & 448

(1984).  The second prong "requires that the government prove that there was, at the time of

the search . . . an actual other investigation that would have led to discovery of the otherwise

unconstitutionally obtained evidence."  Id. at 923-24 (quoting United States v. James, 353

F.3d 606, 617 (8th Cir. 2003)).  The prosecution must establish "by a preponderance of the

evidence that the information ultimately or inevitably would have been discovered by lawful

means."  Nix, 467 U.S. at 444.  The Eighth Circuit has found that the inevitable discovery

exception applies when unlawfully obtained evidence would have been identified during a lawful inventory search conducted according to an established police department procedure. See United States v. Alvarez-Gonzalez, 319 F.3d 1070, 1072 (8th Cir. 2003) (holding that "discovery of [defendant's] gun . . . was inevitable" because defendant would have been detained anyway and there was a "reasonable probability" that defendant's vehicle "would have been towed . . . and a routine inventory search of the vehicle would have been conducted," during which "the firearm would have been inevitably discovered").

In this case, although the handgun was found during a search incident to arrest contrary to Gant, the handgun would have been inevitably discovered as part of an inventory search following the arrest of Garreau for driving with a suspended license and on the outstanding warrant. The Inventory Policy requires an inventory of the contents of all vehicles impounded or taken into protective custody. Due to his arrest and inability to identify anyone who could pick up the vehicle from the site of the arrest, Garreau's vehicle would have been inevitably impounded, thereby mandating an inventory of the vehicle's contents. This inventory, under the terms of the Inventory Policy, would have included "all areas of the vehicle, trunk, glove compartment and luggage or other closed containers within the vehicle." Whether the location of the gun when seized is best characterized as an area of the trunk or a closed container within the vehicle, the gun would have been inevitably found as part of an inventory search, thereby satisfying prong one of the inevitable discovery test. The Government also has met its burden on prong two, for at the time of the search the police were actively pursuing an investigation into Garreau's warrant for driving with a suspended license. This is evident by the fact that Garreau was in custody for this offense when the

-14-

search occurred.  Accordingly, evidence of the search of the vehicle and seizure of the firearm is not suppressed under the exclusionary rule and, therefore, is admissible at trial.

**B.  Statements Made in Patrol Car**

Garreau next argues that he was not advised of his Miranda rights prior to making incriminating statements while sitting handcuffed in Trooper Stahl's patrol car.  He contends that he was in custody at the time he was questioned and was asked questions eliciting potentially incriminating answers, thereby entitling him to Miranda warnings.

To protect a suspect's Fifth Amendment right not to be "compelled in any criminal case to be a witness against himself," the Supreme Court created concrete constitutional guidelines requiring that the suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  Miranda warnings, however, are not required for "[g]eneral on-the-scene questioning as to facts surrounding a crime," which does not present "the compelling atmosphere inherent in the process of in-custody interrogation."  Miranda, 384 U.S. at 477-78.  In order for Miranda to apply, the challenged statements must have been made while the suspect was in custody and in response to interrogation.  United States v. Howard, 532 F.3d 755, 761 (8th Cir. 2008).

The ultimate inquiry in the custody analysis "is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).  "Two discreet inquiries are essential to the determination: first,

what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." LeBrun, 363 F.3d at 720 (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). A court must, in its analysis, "keep[ ] in mind that the [custody] determination is based on the objective circumstances of the interrogation, not the subjective views harbored by either the interrogating officers or the person being questioned." Id. (internal quotation and citation omitted).

At the time Officer Wollman and Garreau conversed, Garreau was in handcuffs, under arrest, and sitting in the back seat of a locked patrol car. Garreau was, without question, in custody within the meaning of Miranda at the relevant time.

Garreau, without question, was subject to "interrogation" by Officer Wollman. "[I]nterrogation includes both direct questions and words or actions that an officer should know are reasonably likely to elicit an incriminating response from the suspect." United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009) (internal citations omitted), cert. denied 129 S.Ct. 2812 (2009). Determining whether specific questions or statements amount to interrogation depends on the circumstances of each case, particularly whether they are objectively and reasonably likely to result in incriminating responses by the suspect, as well as the nature of the context in which they are given. Rhode Island v. Innis, 446 U.S. 291, 300-02 (1980). After the handgun was found, Officer Wollman went to Trooper Stahl's patrol car to talk to Garreau. There, Officer Wollman identified himself and said that he and Trooper Stahl had found the stolen gun in the vehicle Garreau had been driving. Officer Wollman then asked Garreau about the gun, whereupon Garreau admitted that he knew the

gun was stolen.  Garreau had said nothing about a stolen gun being in the vehicle before the gun was found.  Officer Wollman's question was the kind of investigative query that was at least reasonably likely to elicit an inculpatory reply from Garreau and thus constituted "interrogation" under <u>Miranda</u>.

Garreau's statements, confessing knowledge of the handgun being stolen, were therefore the result of custodial interrogation, prior to which he should have been, but was not, advised of his <u>Miranda</u> rights.  Consequently, his statements must be suppressed and cannot be used as substantive evidence at trial.  <u>See</u> <u>United States v. Stoneman</u>, No. CR 09-30101-RAL, 2010 U.S. Dist. LEXIS 38837, at *16-17 (D.S.D. Apr. 20, 2010) (citing <u>Miranda</u>, 384 U.S. at 475); <u>see</u> <u>also</u> <u>Harris v. New York</u>, 401 U.S. 222, 226 (1971).

Suppressed statements made in response to a custodial interrogation, however, may be admitted for impeachment purposes if the defendant testifies at trial, so long as the statements were voluntary.  <u>See</u> <u>Harris</u>, 401 U.S. at 226.  The premise behind allowing tainted evidence to be used as impeachment is simple: If the defendant takes the witness stand and gives testimony that is inconsistent with his own previously recorded statements or other evidence, the Constitution does not require the Government to leave the lie unchallenged, for to do so would permit the defendant to use the law as a means of effectuating perjury.  <u>United States v. Baftiri</u>, 263 F.3d 856, 857 (8th Cir. 2001); <u>see</u> <u>also</u> <u>United States v. Rowley</u>, 975 F.2d 1357, 1361 (8th Cir. 1992) (voluntary statements, even if otherwise inadmissible, may be used to impeach a testifying defendant).

Garreau's statements to Officer Wollman were made voluntarily and were not the product of coercion, express or implied.  No threats or promises were made to Garreau and

no undue influence or pressure was exerted on him.  Garreau agreed to talk about the handgun with Officer Wollman at the scene and did so without hesitation.  There can be little doubt that Garreau's statement was voluntary and not the offspring of coercive action that undermined his ability to exercise his free will and decide for himself what he wanted to do.  This being the case, Garreau's inculpatory statement relating to the stolen gun is admissible at trial for impeachment purposes when and if he testifies.  See Oregon v. Haas, 420 U.S. 714, 720-24 (1975); Harris, 401 U.S. at 223-26; see also United States v. Havens, 446 U.S. 620, 624-28 (1980) (holding that the rationale of Haas and Harris permits the use of illegally obtained evidence to impeach statements made by the defendant on cross-examination); Stoneman, 2010 U.S. Dist. LEXIS 38837, at *17 (concluding that the defendant's incriminating but voluntary statements, made without the necessary waiver of Miranda rights, were admissible for impeachment purposes).

## C. Statements Made at Hughes County Jail

Garreau also seeks to suppress the statements he made to Officer Wollman and Special Agent Baldwin at the Hughes County Jail under the "fruit of the poisonous tree" doctrine set out in Wong Sun v. United States, 371 U.S. 471 (1963).  The Government does not intend to introduce these statements in its case in chief, but requests that this Court find that the statements were not coerced and may be used for impeachment purposes.  Garreau argues that his admissions flow from an illegal search of the car he was driving.  The Court, however, has determined that the vehicle search and seizure of the firearm are admissible under the inevitable discovery exception to the exclusionary rule and for this reason, Garreau's argument does not succeed.  Determination of whether Garreau's subsequent

-18-

statements emanated from, or were tainted by, the Miranda violation requires additional analysis.

The Fourth Amendment generally requires a "'broad application' of the exclusionary rule." United States v. Fellers, 397 F.3d 1090, 1094 (8th Cir. 2005) (quoting Oregon v. Elstad, 470 U.S. 298, 306 (1985)). In the Fourth Amendment context, the exclusionary rule serves to deter unreasonable searches and seizures regardless of the probative value of their fruits. Id. at 1095. "Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality." United States v. Simpson, 439 F.3d 490, 493 (8th Cir. 2006) (internal citations omitted).

As discussed above, the exclusionary rule has general exceptions for "attenuated connection," "independent source," and "inevitable discovery." On this issue, the attenuated connection exception merits further discussion. When the fruit of a Fourth Amendment violation is a confession, the exclusionary rule is applied "to ensure that the confession is not causally linked to the initial illegality." Id. (citing Brown v. Illinois, 422 U.S. 590, 602-03 (1975)). In such cases, Miranda warnings subsequent to the police illegality will not, by themselves, attenuate the taint of an unconstitutional search and seizure. Brown, 422 U.S. at 602; see also United States v. Vega-Rico, 417 F.3d 976, 979 (8th Cir. 2005) (noting that "[t]he giving of Miranda warnings, followed by the making of a voluntary statement, does not, in and of itself, mandate a statement's admissibility.").

To break the causal chain between a prior Miranda violation and subsequently made statements, Wong Sun requires that the latter statements be "sufficiently an act of free will to

-19-

purge the primary taint." 371 U.S. at 846. In determining whether a confession is the

product of a free will, courts consider "Miranda warnings, the temporal proximity of the

arrest and the confession, the presence of intervening circumstances, and particularly, the

purpose and flagrancy of the official misconduct." Vega-Rico, 417 F.3d at 976 (quoting

United States v. Hernandez-Hernandez, 384 F.3d 562, 565) (8th Cir. 2004).

  Garreau's statements were sufficiently an act of free will to purge the primary taint.

On the one hand, the length of time between the prior Miranda violation and Garreau's

statements at the Hughes County Jail - approximately one hour and seven minutes in between

the arrest and interrogation, of which 10-15 minutes consisted of a ride in the patrol car - was

not particularly long. (T. 39); See Brown, 422 U.S. at 604 (statement separated from illegal

arrest by less than two hours not attenuated); Taylor v. Alabama, 457 U.S. 687 (1982)

(confession six hours after illegal arrest not purged of taint of illegal arrest); Dunaway v. New

York, 442 U.S. 200, 203 (1979) (incriminating statements made within an hour of illegal

arrest not sufficiently attenuated). However, the length of time, in conjunction with

intervening circumstances including the change in location and the substitution of Agent

Baldwin for Trooper Stahl, weigh in favor of a finding of attenuation. In addition, it is

undisputed that Garreau received Miranda warnings and waived his Miranda rights prior to

making any statements at the jail, and the facts further demonstrate that Officer Wollman and

Agent Baldwin conducted the interview in a professional manner and acted with no bad

purpose. It also appears that questioning by Officer Wollman at the scene was brief.

  For cases involving a "two-step" interrogation - an interrogation in which there is a

subsequent administration of Miranda warnings to a suspect who previously provided a

voluntary but unwarned statement - the Eighth Circuit has adopted the approach that, in order

for the subsequent statements to be fruit of the poisonous tree, the two-step interrogation

must be a "designed, deliberate, or calculated circumvention of Miranda." United States v.

Elzahabi, 557 F.3d 879, 884 (8th Cir.), cert. denied, 129 S.Ct. 2781 (2009); accord United

States v. Torres-Lona, 491 F.3d 750, 757 (8th Cir. 2007).

Unlike the defendant in Missouri v. Seibert, 542 U.S. 600 (2004), Garreau was not

subjected to an interrogation technique intended to drain the substance out of Miranda or to

thwart its purpose. No improper tactics were employed by Officer Wollman or Agent

Baldwin, and the two questioning sessions were separated by both time and location. Where,

as here, the initial statement was voluntary, the proper inquiry is whether Garreau's

subsequent statements, after being properly advised of his rights, were voluntary based on the

surrounding circumstances. See Elstad, 470 U.S. at 318. The Court concludes that these

statements were indeed voluntary.

No evidence was presented that Officer Wollman used compulsion in eliciting

Garreau's first statement, that the Miranda waiver signed by Garreau before the second

statements was not knowing, voluntary, or intelligent, or that the later statements were in any

way coerced. The subsequent statements not only concerned the handgun but also Garreau's

use of illegal drugs, the latter being a separate and independent basis for a Miranda

advisement prior to questioning him on this subject matter. Garreau's statements at the

Hughes County Jail were knowingly, voluntarily, and intelligently made. Under the

circumstances, the statements were not invalidated by his prior, illegally obtained statement

and need not be suppressed. United States v. Walker, 518 F.3d 983, 985-86 (8th Cir. 2008)

-21-

**D. Urine Sample**

Garreau also moves under the fruit of the poisonous tree doctrine to suppress the urine

sample that he consented to at the Hughes County Jail. For the same reasons that the Hughes

County Jail statements need not be suppressed, neither must the urine sample.

The Supreme Court has held that the failure to give <u>Miranda</u> warnings does not

require the suppression of physical evidence derived from a suspect's unwarned, but

voluntary, statements. <u>United States v. Patane</u>, 542 U.S. 630, 641-44 (2004); <u>see also</u> <u>United

States v. Buchanan</u>, No. CR 07-50118-AWB, 2008 WL 2704865, at *2-3 (D.S.D. 2008)

(denying motion to suppress derivative evidence obtained after an <u>Edwards</u> violation based

on the Exclusionary Rule), <u>aff'd</u>, 574 F.3d 554 (8th Cir. 2009). In addition, Garreau

consented to providing the urine sample and that consent was voluntary based on the totality

of the circumstances. <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222, 226-27 (1973); <u>see

also</u> <u>United States v. Mendenhall</u>, 446 U.S. 544, 557-58 (1980) (the evidence plainly

supported the trial court's view that the defendant's consent to search of her person at DEA

office was freely and voluntarily given). His custodial status does not suffice under the

circumstances to vitiate the voluntariness of his consent. <u>See</u> <u>United States v. Watson</u>, 423

U.S. 411, 424-25 & n.14 (1976); <u>see also</u> <u>United States v. Sanders</u>, 424 F.3d 768, 773-74 (8th

Cir. 2005) (applying personal and environmental characteristics and concluding that the

search of the defendant's person was voluntarily given).

The Government has advised the Court that it will not utilize evidence derived from

the urine sample. (Doc. 23, at 7). The Government does request, however, that the Court

find that the urine sample was not obtained as a deliberate, intentional attempt to illegally

secure evidence.  As discussed above, the Court finds that none of the evidence at issue in

Garreau's motion was obtained as part of such an attempt.  Therefore, the urine sample may

also be offered for impeachment purposes at trial.

## IV.  CONCLUSION

Based on the foregoing, it is hereby

ORDERED that Defendant's factual Objections to the Report and Recommendation

for Disposition of Motion to Suppress Evidence and Statements (Doc. 37) are sustained.  It is

further

ORDERED that Defendant's Motion to Suppress Evidence and Statements (Doc. 14)

is denied with respect to the search of the car, the evidence of a firearm found in the car, the

statements made at the Hughes County Jail, and the urine sample, but granted with respect to

the statements made in the patrol car.  It is further

ORDERED that the Court declines to adopt the Magistrate Judge's Report and

Recommendation (Doc. 29) and Corrigendum/Clarification of Report and Recommendation

(Doc. 32).

Dated this 19th day of August, 2010.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE